Jesse Hindman, Cal. Bar No. 222935
**HINDMAN APC**
402 W. Broadway, Suite 1520
San Diego, CA  92101
Telephone: (619) 255-4078
Email: jesse@hindmanapc.com

Donald R. Ware, Mass. Bar No. 516260
Email: dware@foleyhoag.com
*pro hac vice* application forthcoming
Barbara A. Fiacco, Mass. Bar No. 633618
Email: bfiacco@foleyhoag.com
admitted *pro hac vice*
Jeremy Younkin, Mass. Bar No. 654047
Email: jyounkin@foleyhoag.com
*pro hac vice* application forthcoming
Joanna L. McDonough, Mass. Bar No. 699056
Email: jmcdonough@foleyhoag.com
*pro hac vice* application forthcoming
**FOLEY HOAG LLP**
155 Seaport Boulevard
Boston, MA 02210
Phone: (617) 832-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BECTON, DICKINSON AND COMPANY, SIRIGEN, INC., and SIRIGEN II LIMITED | Case No. 21-cv-01173-WQH-MSB |
| Plaintiffs, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | **ORAL ARGUMENT REQUESTED** |
| BECKMAN COULTER, INC., | Date: August 2, 2021 |
| Defendant. | **NO ORAL ARGUMENT UNLESS REQUESTED BY COURT** |
| | Judge: William Q. Hayes |

21-cv-01173-WQH-MSB

# TABLE OF CONTENTS

I. NATURE AND STAGE OF PROCEEDINGS.................................................1

II. SUMMARY OF ARGUMENT.......................................................................1

III. STATEMENT OF FACTS ...........................................................................2

    A. BD Has Long Been an Innovator in Flow Cytometry .........................2

    B. Innovation is a Core BD Corporate Value, and a Critical Aspect of its Brand, Marketing, and Business Strategy. ......................................3

    C. BD Acquires Sirigen and Launches Its BD Horizon Brilliant™ Dyes....................................................................................................4

    D. BD Sells Both Research and Clinical Reagents...................................5

    E. The Asserted Patents ...........................................................................6

    F. Beckman Develops and Launches Infringing SuperNova Dyes That Compete Directly with BD's Horizon Brilliant™ Products.........7

IV. ARGUMENT................................................................................................9

    A. Likelihood of Success on the Merits....................................................9

        1. Beckman is Infringing the '989 and '285 Patents ....................10

            a. The '989 Patent..............................................................10

            b. The '285 Patent..............................................................12

    B. BD will Suffer Irreparable Harm in the Absence of Injunctive Relief .................................................................................................14

        1. Beckman's Continuing Infringement will Irreparably Harm BD .............................................................................................15

            a. Beckman's SuperNova Dyes Compete Directly with BD's Horizon Brilliant Violet Dyes...............................15

            b. Beckman's Continuing Infringement Will Cause Irreparable Reputational Harm .......................................17

            c. Loss of Research and Development ...............................18

    C. Balance of Hardships..........................................................................19

    D. The Public Interest..............................................................................20

V. CONCLUSION.............................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Andrx Pharm., Inc.*,
452 F.3d 1331 (Fed. Cir. 2006) ..........................................................................20

*Apple Inc. v. Samsung Elecs. Co.*,
809 F.3d 633 (Fed. Cir. 2015) .............................................................................14

*Bio-Technology Gen. Corp. v. Genentech, Inc.*,
80 F.3d 1553 (Fed. Cir. 1996) ....................................................................... 18, 19

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012) ................................................................ 15, 16, 20

*Dominion Res. Inc. v. Alstom Grid, Inc.*,
2016 U.S. Dist. LEXIS 136728 (E.D. Pa. Oct. 3, 2016) ......................................18

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
717 F.3d 1336 (Fed. Cir. 2013) ....................................................... 15, 17, 18, 20

*Illumina, Inc. v. BGI Genomics Co.*,
2020 U.S. Dist. LEXIS 105080 (N.D. Cal., June 13, 2020) ................................16

*Novozymes A/S v. Genecor Int'l, Inc.*,
474 F. Supp. 2d 592 (D. Del. 2007) .....................................................................16

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011) ...........................................................................19

*Sanofi-Synthelabo v. Apotex, Inc.*,
470 F.3d 1368 (Fed. Cir. 2006) ...........................................................................20

*Sciele Pharma, Inc. v. Lupin Ltd.*,
684 F.3d 1253 (Fed. Cir. 2012) ....................................................................... 9-10

*Tinnus Enters., LLC v. Telebrands Corp.*,
846 F.3d 1190 (Fed. Cir. 2017) ...........................................................................17

*Trebro Mfg., Inc. v. FireFly Equip.*,
748 F.3d 1159 (Fed. Cir. 2014) ......................................................... 9, 14, 15, 16

*TruePosition Inc. v. Andrew Corp.*,
568 F. Supp. 2d 500 (D. Del. 2008) .....................................................................16

*Windsurfing Int'l Inc. v. AMF, Inc.*,
   782 F.2d 995 (Fed. Cir. 1986) ..............................................................................19

**Statutes**

35 U.S.C. § 282 ......................................................................................................10

MEMORANDUM OF POINTS AND AUTHORITY IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## I.   NATURE AND STAGE OF PROCEEDINGS

Plaintiffs Becton, Dickinson and Company ("BD") and its subsidiaries, Sirigen, Inc. ("Sirigen"), and Sirigen II Limited ("Sirigen II") (collectively, "Plaintiffs") have sued Beckman Coulter, Inc. ("Beckman") for infringement of thirteen United States patents awarded by the United States Patent and Trademark Office (USPTO) between 2013 and 2021.  The patents are directed to high-brightness, water soluble polymer dyes and to systems and methods for using such dyes to detect biological materials in a sample.  BD's dye technology is widely used in the field of flow cytometry, by which researchers and clinicians are able to detect the presence of biomarkers on individual cells according to the nature and extent of fluorescence emitted by dyes bound to the cells.  Recently, Beckman has launched multiple products that infringe these patents in an unlawful attempt to exploit BD's pioneering technology and reap the rewards the patent system reserves to innovators.

Although Plaintiffs allege infringement of all thirteen patents, Plaintiffs' Motion for a Preliminary Injunction focuses on claims 1 and 7 of U.S. Patent No. 10,458,989 (the "'989 patent") and claims 1 and 7 of U.S. Patent No. 10,365,285 (the "'285 patent") (collectively, the "PI Patents").  Plaintiffs seek a preliminary injunction enjoining Beckman, pending final judgment, from (1) selling or offering for sale in the United States any products containing the polymer dyes Beckman markets as "SuperNova Dyes," including SuperNova v428, SuperNova v605, SuperNova v786, and any other polymer dyes that infringe the PI Patents; and (2) taking any other actions with respect to such dyes that induce others to practice the PI Patents.

## II.   SUMMARY OF ARGUMENT

Nearly a decade after BD introduced its revolutionary Horizon Brilliant™ polymer dyes in the flow cytometry market, Beckman launched its copycat

SuperNova Dyes to compete directly with BD's patented dyes.  Plaintiffs are likely to succeed on the merits and can readily show infringement of the asserted claims of the '989 and '285 Patents, which are presumed valid under the patent statute.  Plaintiffs will suffer long-term, irreparable harm if a preliminary injunction is not granted.  Beckman's infringing conduct during the pendency of this litigation is knowing and willful, and (1) is in direct competition with BD's innovative polymer dye products; (2) will materially and irreparably harm BD's hard-earned reputation for innovation and brand distinction; and (3) will impair BD's ability to invest in research and development.

## III.   STATEMENT OF FACTS

The facts supporting Plaintiffs' Motion for Preliminary Injunction are set forth in the accompanying declaration of Kenneth Gelhaus, Vice President and General Manager – Clinical Solutions, BD Biosciences ("Gelhaus Decl."), the expert declaration of Timothy M. Swager, Ph.D. ("Swager Decl."), and the attorney declaration of Barbara Fiacco ("Fiacco Decl.").[1]

### A.   BD Has Long Been an Innovator in Flow Cytometry

BD, a medical technology company with its roots dating back to the 19th century, has a long history of innovation in flow cytometry.  Gelhaus Decl. ¶ 13. Flow cytometry employs instruments that cause cells in a sample to move through a narrow stream of fluid and pass by a series of lasers one-by-one, allowing the instrument to identify, count and characterize cells at single-cell resolution.  *Id*. at ¶ 5.  To analyze cells using flow cytometry, a researcher treats them with reagents that recognize and label cells according to specific proteins they express. These reagents may be in the form of a "complex" (also called a "conjugate") that includes a fluorescent dye linked to a sensor (such as an antibody) capable of

---

[1] Exhibits to the Gelhaus Decl., Swager Decl., and Fiacco Decl. are referred to as "Gelhaus Ex.", "Swager Ex.", and "Fiacco Ex.", respectively.

binding specifically to a cellular protein of interest.  When the labeled cell passes by a laser, the attached dye fluoresces (lights up) at a specific wavelength (color), allowing the instrument to detect the presence and concentration of the protein on the cell.  Using multiple dyes that fluoresce at different wavelengths (a "multi-color reagent panel"), a researcher or clinician can analyze cells in a sample for multiple different properties as part of a single test, an efficient and cost-effective laboratory technique called multiplexing.  *Id.* at ¶¶ 7-10.

BD launched the first commercial embodiment of a fluorescence-activated flow cytometer in the 1970s, and has continued to innovate ever since.  Gelhaus Decl. ¶ 15.  Just two years ago, in 2019, BD launched the first 12-color panel flow cytometer, the BD FACSLyric™ flow cytometer, for the *in vitro* diagnostics market.  *Id.*  BD has also made numerous important advances in flow cytometry reagents over the years.  *Id.* at ¶ 16.  For example, BD was the first (and still only) company to provide a 6-color *in vitro* diagnostic assay panel cleared for use in the U.S. and Europe to identify and count T cells, B cells, and natural killer (NK) cells to aid clinicians in assessing and monitoring immune deficiency.  *Id.*

### B.   Innovation is a Core BD Corporate Value, and a Critical Aspect of its Brand, Marketing, and Business Strategy.

As BD's then-Chief Technology Officer recently commented in a blog post, "It's hard to overstate how much innovation matters at BD."  *See* Gelhaus Decl. ¶ 13; Gelhaus Ex. 1.  BD has repeatedly been recognized for its innovation.  *Id.* at ¶ 14.  For example, in 2021, BD was named in Clarivate's Top 100 Global Innovators list for the sixth time.  *Id.* at ¶ 14; Gelhaus Ex. 2.  In 2020, Fortune named BD to its Change the World List (for the fourth time in six years) in recognition of BD's rapid response in addressing critical healthcare needs during the coronavirus pandemic.  *Id* at ¶ 14; Gelhaus Ex. 3.  Also in 2020, Frost & Sullivan recognized BD with a 2020 Global Technology Innovation Award.  *Id.* at ¶ 14; Gelhaus Ex. 4.  BD currently invests more than $1 billion annually into

bringing cutting-edge clinical and research technology to the market.  Gelhaus Ex. 2.

### C. BD Acquires Sirigen and Launches Its BD Horizon Brilliant™ Dyes

In August 2012, BD acquired a small company called Sirigen in a transaction valued at approximately $64 million.  Gelhaus Decl. ¶ 18.  Sirigen was founded by scientists at the University of California, Santa Barbara.  *Id.*  Sirigen scientists developed groundbreaking dyes based on polymer chemistry that exhibited unprecedented brightness when excited by a laser.  *Id.*  The high brightness of Sirigen's polymer dyes, combined with their high water-solubility, made it much easier (and in some cases, made it possible) for researchers to detect proteins of interest when they appear in low density in a cell population.  *Id.*  With traditional dyes, the low density of rare cell-surface proteins yields a relatively dim signal, in some cases making the presence of the protein of interest undetectable. *Id.*; *see also* Gelhaus Ex. 5.

The acquisition of Sirigen was a key part of BD's strategy to reestablish reagent sales growth through innovation.  Gelhaus Decl. ¶ 20.  In the years leading up to the acquisition, the reagent market had become increasingly commoditized, and pricing had become a significant factor in customers' purchasing decisions. *Id.*  BD's competitors undercut BD's prices, and BD's worldwide market share for flow cytometry reagents fell.  *Id.*  The Sirigen acquisition gave BD the opportunity to develop breakthrough new dyes that would highlight BD's culture of innovation, differentiate BD's reagent portfolio from the traditional dye market segment, and command a premium price.  *Id.*

In 2011, BD launched its first polymer dyes excited by the violet laser. Gelhaus Decl. ¶ 21.  In 2012, it followed up with a "tandem" dye (*i.e.*, a macromolecule that combines a "base" polymer dye with a second dye in order to shift the emission spectrum of the base dye to a higher wavelength, thus changing

its color).  *Id.*  BD added two more tandem dyes in 2013.  *Id.*  BD has continued to develop and launch new high brightness polymer dyes for the violet laser.  *Id.*  It currently sells three base BV dyes (BV421, BV480 and BV510) and five tandem BV dyes (BV605, BV650, BV711, BV750, and BV786).  *Id.*  The numbers reflect the wavelength, in nanometers, at which the dye emits light.

Using Sirigen's patented technology, BD scientists also developed a family of high brightness polymer dyes excited by an ultraviolet laser, taking advantage of even more of the light spectrum to provide a wider range of different colors of fluorescence.  *Id.* at ¶ 22.  BD has developed seven BD Horizon Brilliant™ Ultraviolet (BUV) dyes.  *Id.*  BD has invested at least about $100 million dollars in its polymer dye technology.  *Id.* at ¶ 24.

### D.     BD Sells Both Research and Clinical Reagents

BD sells its high brightness polymer dyes in two different markets: the research use only (RUO) market and the clinical diagnostic market.  Gelhaus Decl. ¶ 27.  RUO reagents are used in research settings, such as laboratory research directed to cancer or infectious disease.  *Id.*

BD's dyes for clinical diagnostic use are classified as analyte specific reagents ("ASRs").  Gelhaus Decl. ¶ 28.  Among BD's customers of ASR dyes are clinical laboratories that use the ASRs to create laboratory-developed tests ("LDTs") to detect the presence of proteins of interest in a cell population.  *Id.* at ¶ 29.  Because these tests are used for diagnostic purposes and are laboratory-specific, they usually require months of work to develop and validate before they are used in a clinical diagnostic setting.  *Id.*  Prior to the recent launch of Beckman Coulter's SuperNova Dyes, BD was the exclusive manufacturer of high brightness polymer dyes for the ASR market.  *Id.* at ¶ 30.  In 2017, BD sued Affymetrix, Inc. and Life Technologies Corp., subsidiaries of Thermo Fisher Inc., for patent infringement.  *Id.* at ¶ 34.  BD's lawsuit alleged that the defendants' accused

polymer dyes (sold for research use only under the "Super Bright" trade name) infringed multiple patents owned by or licensed to BD, several of which likewise are asserted here against Beckman. *See id.* Before trial, the parties reached a confidential settlement. *Id.* Thermo Fisher now sells its "Super Bright" polymer dyes for research use only and informs its customers that "Super Bright Dyes" are sold under license from BD. *Id.* at ¶ 35. BD has not authorized any third party to sell polymer dyes as ASRs for clinical use. *Id.* at ¶ 33.

### E.    The Asserted Patents

BD and its Sirigen subsidiary are widely recognized as the innovators of high brightness polymer dyes for use in flow cytometry. BD relies on patents it owns or licenses, including the PI Patents and the other Asserted Patents, to protect its investment in innovation while providing groundbreaking technologies to customers, thereby advancing scientific research and clinical diagnostic methods.

The Asserted Patents, including the PI Patents, share a common specification, derived from U.S. patent application No. 13/009,764 (the "'764 application"). The common specification of the Asserted Patents first published on July 28, 2011 as PCT publication WO2011/091086 ("PCT '086").

The specification describes water soluble "conjugated polymers" and methods of using the claimed polymers in assay methods. Conjugated polymers have an extended chain, or backbone, of repeat units capable of excitation and emission. The repeat units are linked into the polymer chain in a way that allows their individual electronic systems to interact. The resulting "π-conjugated system" of repeat units (hence, the name "conjugated polymer") allows energy to transfer up and down the polymer backbone. As a consequence, conjugated polymer dyes (generally referred to herein simply as "polymer dyes") are much better collectors and emitters of light, and thus much brighter, than small molecule fluorescent dyes. Swager Decl. ¶¶ 21-22.

Among other things, the specification describes water soluble conjugated polymers that comprise "polycyclic aryl" repeat units, including bridged biphenyl groups, and non-ionic side chains including polyethylene glycol ("PEG") to impart water solubility.  As will be seen, these properties equally describe Beckman's accused SuperNova Dyes.

## F.   Beckman Develops and Launches Infringing SuperNova Dyes That Compete Directly with BD's Horizon Brilliant™ Products

In April 2017, nearly six years after BD's PCT '086 published, Beckman filed a copycat PCT patent application and subsequent United States national stage application, which published as US 2019/0144601 (the "'601 application"). Beckman's '601 application is directed to its purported invention of "water soluble fluorescent polymers and methods for detecting analytes in a sample using complexes comprising the fluorescent polymers conjugated to binding agents." Swager Ex. 8 at [0071].  Beckman's application reflects blatant piracy of the inventions described in the specification of the Asserted Patents.  As in the Asserted Patents, Beckman's claimed polymer dyes comprise polycylic repeat units that are bridged biphenyl groups with non-ionic side groups to impart water solubility, including a species of polyethylene glycol called "PEG-11" that is specifically recited in the claims of the PI Patents.  *See id*. at [0149]; '989 patent, claim 7; '285 patent, claim 7.[2]  Like the polymers claimed in the Asserted Patents, Beckman's polymers include an optional linker unit (referred to as "M" which is "capable of altering the polymer band gap and is evenly or randomly distributed along the polymer main chain"), optional linkers (referred to as L), and end caps (referred to as G1 and G2).  Swager Ex. 8 at ¶¶ [0008], [0016], [0019], and [0020]. As in BD's PCT '086 application, Beckman identified the number of repeat units

---

[2] A copy of the '989 patent is included as Swager Ex. 2.  A copy of the '285 patent is included as Swager Ex. 3.

in its polymer as "m," "an integer from 1 to about 10,000." Swager Ex. 8 at ¶ [0023].

In 2019, Beckman presented conference abstracts that provided more specific information about the structure of the conjugated polymer dyes it was developing, including SuperNova v428. The abstracts' description was consistent with the information disclosed in Beckman's '601 application. *See* Swager Decl. ¶ 38; Swager Ex. 6 at 2-3.

Two years after its conference presentations, on March 30, 2021, Beckman launched the first three dyes in its series of high-brightness water soluble polymer dyes for use as flow cytometry reagents. Fiacco Ex. 1 at 1-3. Beckman proceeded with its infringing launch despite the fact that on February 26, 2021, BD brought to Beckman's attention several of the Asserted Patents, including the two PI patents. Gelhaus Decl. ¶ 31.

Beckman launched its infringing products into both the RUO and ASR markets. Beckman currently is offering for sale and selling three ASR antibody-dye conjugates with its SuperNova v428 base dye. Fiacco Ex. 2 at 2-3. In addition to being offered for sale on Beckman's website, at least one of Beckman's ASR products currently is offered for sale on the web site of Fisher Scientific, a distributor of flow cytometry reagents that also distributes BD's Brilliant Violet products. Fiacco Ex. 3.

Beckman also sells its v428 polymer dye conjugated (attached) to a CD-22 antibody for research use only. Beckman promotes its SuperNova v428 as "equivalent" to BD's BV421. Beckman's website includes a white paper that directly compares the flow cytometry results of SuperNova v428 and BD's BV421. Swager Ex. 5 at 3. Likewise, a Beckman brochure available on its website directly compares the flow cytometry results of SuperNova v605 and v786 with BD's BV610 and BV786. Swager Ex. 4 at 5 ("SuperNova [v605 and v786 conjugated

antibodies] were compared to their BV 610 and BV 786 equivalent . . .").

Beckman's marketing brochure for these dyes describes them as "SuperNova Polymer Dyes *A Stellar New Way to See Dim Populations*." Swager Ex. 4 at 1 (emphasis added). Indeed, Beckman promotes its SuperNova v428 as "particularly suited for the assessment of dimly expressed markers" *in flow cytometry*. Ex. 4 at 2. This language mirrors the advantages BD promotes for its BD Brilliant Violet products. *See* Fiacco Ex. 5.

Beckman also offers for sale its SuperNova Dyes, v428, v605, and v786, through its LUCID Custom Design Services, a service that offers to conjugate the accused SuperNova Dyes to more than *six hundred thirty* different antibodies at a customer's request. Fiacco Ex. 2 at 3; Fiacco Ex. 4 at 1. SuperNova v605 and SuperNova v786 are tandem polymer dyes, adding a second fluorescent dye to the core SuperNova v428 dye. Swager Ex. 4 at 5. In its marketing materials, Beckman promotes its two SuperNova tandem dyes as "counterparts" to BD's BV 605 and BV786. *Id.* at 5.

Beckman's launch of the accused SuperNova Dyes is just the beginning of its infringement plans. In a March 30, 2021 press release promoting its SuperNova launch, Beckman promised that "new conjugated antibodies will be introduced on a regular basis." Fiacco Ex. 1 at 2. In its SuperNova brochure, Beckman describes its v428 as "the first dye of the series." Swager Ex. 4 at 1.

## IV. ARGUMENT

### A. Likelihood of Success on the Merits

To prove a likelihood of success on the merits, a patentee must demonstrate that establishing infringement is more likely than not. *Trebro Mfg., Inc. v. FireFly Equip.*, 748 F.3d 1159, 1166 (Fed. Cir. 2014). BD is likely to succeed on the merits because it can readily show infringement of claims 1 and 7 of the '989 patent and claims 1 and 7 of the '285 patent, which under patent law are presumed

valid.  *See Sciele Pharma, Inc. v. Lupin Ltd.*, 684 F.3d 1253, 1259-60 (Fed. Cir. 2012); 35 U.S.C. § 282.

### 1.    Beckman is Infringing the '989 and '285 Patents

Beckman's offers to sell and sales of its SuperNova v428, v605, and v786 products infringe, directly or indirectly, the PI Patents. After carefully reviewing the '989 patent, the '285 patent, and Beckman's marketing materials describing its SuperNova Dyes, Dr. Timothy M. Swager, a Professor of Chemistry at M.I.T. and a leading expert in the field of electronically active polymers, has submitted his detailed expert opinion explaining how the Accused Products infringe each of these claims.  *See* Swager Decl. §§ X-XII.

### a.    The '989 Patent

Claim 1 of the '989 patent recites a conjugated polymer having a backbone of π-conjugated repeat units:

$$G_2 \text{---} \left[ \left( Ar \right)_a - \left( Mu \right)_b - \left( L_1 \right)_c - \left( L_2 \right)_d \right]_n \text{---} G_1$$

As shown above, the structure of the recited conjugated polymer includes repeat unit Ar, which, claim 1 recites, is "an aryl or heteroaryl unit substituted with a non-ionic side group capable of imparting solubility in water."  SuperNova v428, SuperNova v605, and SuperNova v786 have the claimed repeat unit Ar:  they each contain a 9,10-dihydrophenanthrene repeat unit (an aryl unit) that is substituted with a polyethylene glycol (PEG), a non-ionic side group capable of imparting solubility in water).  Swager Decl. ¶ 68.  Claim 1 recites that MU is optional, because it may be present at an abundance of 0%.  Consistent with this, SuperNova v428, SuperNova v605 and SuperNova v786 do not contain an MU.  *Id.* at ¶ 69.  Claim 1 recites that $L_1$ and $L_2$, which are optional, "are each independently an aryl or a heteroaryl group evenly or randomly distributed along the polymer main chain

and are substituted with one or more pendant chains terminated with . . . a conjugated organic dye or biomolecule." As Dr. Swager explains, consistent with the claim, SuperNova V428 does not contain an optional $L_1$ or $L_2$ group. *Id*. at ¶ 70. SuperNova v605 and SuperNova v786 include a repeat unit that meets the definition of the $L_1$ group: a 9,10-dihydrophenanthrene with a conjugated organic dye. *Id.* at ¶ 71. Consistent with the claim, neither SuperNova v605 nor SuperNova v786 includes an optional $L_2$ group. *Id*. at ¶ 72.

Claim 1 also recites $G_1$ and $G_2$, which are "end groups." *Id*. at ¶ 73. They bookend the polymer with a terminating group such as, for example, a hydrogen or an aryl that includes (i.e., is "substituted with one or more pendant chains terminated with") a conjugated organic dye, a biomolecule (such as an antibody), or a functional group such as a carboxylate that could be used to link the polymer to another molecule or biomolecule (*e.g*., the organic dye or antibody). *Id.* Each of SuperNova v428, SuperNova v605 and SuperNova v786 contains the recited $G_1$ and $G_2$: one is "a substituted aryl" that includes an antibody and the other is a "substituted aryl" substituted with a pendant chain terminated with a carboxylate. *Id*. at ¶¶ 74-76.

Claim 1 also recites that the polymer comprises "at least 1 functional group selected from amine, carbamate, carboxylic acid, carboxylate, maleimide, activated ester, N-hydroxysuccinimidyl, hydrazines, hydrazide, hydrazone, azide, alkyne, aldehyde, and thiol within $G_1$, $G_2$, $L_1$ or $L_2$, or a conjugated organic dye or biomolecule". As discussed above, $G_2$ in each of SuperNova v428, SuperNova v605 and SuperNova v786 comprises a carboxylate group or an antibody, thereby satisfying this claim limitation. SuperNova v605 and v786 also comprise, in $L_1$, a conjugated organic dye, which likewise satisfies this claim limitation. *Id.* at ¶ 76.

Claim 1 further recites that "n" listed in the claimed structure represents "the number of repeat units". The SuperNova Dyes have an "n" value of about 24. *Id*.

at ¶ 77.  Finally, claim 1 also recites mol% ranges for a, b, c, and d of the structure depicted above.  SuperNova v428 meets this element of the claim because a is 100%, and b, c, and d are 0%.  *Id*.  SuperNova v605 and SuperNova v786 contain "Ar" and "$L_1$" repeat units, and the $L_1$ repeat unit comprises the organic dye with an average of 2-3 dyes per polymer chain.  Thus, SuperNova v605 and SuperNova v786 meet this element of the claim because a is about 87.5% (21 "Ar" units/ 24 "n" units), c is about 12.5% (3 "$L_1$" units/24 "n" units), and b and d are 0%.  *Id.*

Beckman's SuperNova Dyes also infringe claim 7 of the '989 patent.  Claim 7, which depends from claim 1, recites that the non-ionic side group comprises an ethylene glycol oligomer.  "Ethylene glycol oligomer" refers to a relatively short chain of repeating units of ethylene glycol ($-CH_2-CH_2-O-$).  In addition to meeting the limitations of claim 1, the non-ionic side groups of the Ar units (i.e., the side groups on the 9,10-dihydrophenanthrene repeat units) in SuperNova v428, SuperNova v605 and SuperNova v786 each contains a polyethylene glycol (PEG) group, which is an ethylene glycol oligomer, and therefore they infringe dependent claim 7.  *Id*. at ¶¶ 78-79.

### b.    The '285 Patent

The '285 patent is directed to methods of determining whether a target (such as a protein of interest) is present in a sample, including by contacting the sample with a conjugated polymer complex comprising a sensor for the target (such as an antibody) complexed to a water soluble polymer having the recited structure.  As explained in Dr. Swager's expert declaration, Beckman's offers for sale and sales of SuperNova v428, v605, and v786 for use in flow cytometry constitute active inducement of infringement and contributory infringement of claims 1 and 7.  Swager Decl. §§ XI-XII.

SuperNova v428, v605, and v786 are sold as water soluble conjugated polymers attached to antibodies.  Fiacco Ex. 2 at 2-3.  As explained above, they

include substituted aryl units with a non-ionic side group capable of imparting water solubility. Swager Decl. ¶ 85. Claim 1 recites that MU is optional, because it may be present at an abundance of 0%. Consistent with this, SuperNova v428, SuperNova v605 and SuperNova v786 do not contain an MU. *Id.* ¶ 86. Consistent with the claim, SuperNova V428 does not contain an optional $L_1$ or $L_2$ group. *Id.* at ¶ 87. SuperNova v605 and SuperNova v786 include a repeat unit that meets the definition of the $L_1$ group and, consistent with the claim, do not include an optional $L_2$ group. *Id.* at ¶¶ 88-89. Each of SuperNova v428, SuperNova v605 and SuperNova v786 contains the recited $G_1$ and $G_2$: one is an aryl substituted with a pendant chain terminated with an antibody and the other is an aryl substituted with a pendant chain terminated with a carboxylate. *Id.* at ¶¶ 90-93.

Claim 1 further recites "wherein the polymer comprises at least 1 functional group selected from amine, carbamate, carboxylic acid, carboxylate, maleimide, activated ester, N-hydroxysuccinimidyl, hydrazines, hydrazide, hydrazone, azide, alkyne, aldehyde, and thiol within $G_1$, $G_2$, $L_1$ or $L_2$, or a conjugated organic dye or biomolecule". As discussed above, $G_2$ in each of SuperNova v428, SuperNova v605 and SuperNova v786 comprises a carboxylate group or an antibody, thereby satisfying this claim limitation. SuperNova v605 and v786 also comprise, in $L_1$, a conjugated organic dye, which likewise satisfies this claim limitation. *Id.* at ¶ 93.

Claim 1 further recites that "n is an integer from 1 to about 10,000." The SuperNova Dyes have an "n" value of about 24 and therefore meet this claim limitation. *Id.* at ¶¶ 94-95. Finally, claim 1 also recites mol% ranges for a, b, c, and d of the structure depicted above. SuperNova v428 meets this element of the claim because a is 100%, and b, c, and d are 0%. *Id.* at ¶ 96. SuperNova v605 and SuperNova v786 meet this element of the claim because a is about 87.5% (21 "Ar" units/ 24 "n" units), c is 12.5% (3 "L1" units/24 "n" units), and b and d are 0%. *Id.*

Beckman's marketing materials encourage those working in research and clinical diagnostic laboratories to use the SuperNova antibody-dye conjugates in flow cytometry for the above-described applications, which infringe the method recited in claim 1 of "contacting the sample with a conjugated polymer complex" to "determin[e] whether a target is present in a sample".  Swager Decl. ¶¶ 98-101. The SuperNova antibody-dye conjugates are not a staple article or commodity of commerce capable of substantial non-infringing use.  *Id.* at ¶ 108.  Accordingly, in marketing, offering for sale, and selling its SuperNova line of products, Beckman is actively inducing and contributing to the direct infringement of claim 1 of the '285 patent.

Beckman's customers' use of the SuperNova Dyes, as encouraged by Beckman, also infringes claim 7 of the '285 patent.  Claim 7, which depends from claim 1, recites that the non-ionic side group comprises an ethylene glycol oligomer.  In addition to meeting the limitations of claim 1, the non-ionic side groups of the Ar units (i.e., the side groups on the 9,10-dihydrophenanthrene repeat units) in SuperNova v428, SuperNova v605 and SuperNova v786 each contain a polyethylene glycol (PEG) group, which is an ethylene glycol oligomer, and therefore they infringe dependent claim 7.  *Id*. at ¶¶ 102-104.  For the same reasons as for claim 1 of the '285 patent, Beckman actively induces and contributes to the infringement of this claim.

## B.    BD will Suffer Irreparable Harm in the Absence of Injunctive Relief

A party seeking a preliminary injunction in a patent case must establish that (1) it is likely to suffer irreparable harm absent injunctive relief, *Trebro Mfg., Inc.*, 748 F.3d at 1165, and (2) there is "some connection" between the irreparable harm suffered and the infringement alleged,  *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 641 & n.1 (Fed. Cir. 2015).  BD's motion meets both requirements.

### 1. Beckman's Continuing Infringement will Irreparably Harm BD

BD will suffer irreparable harm if a preliminary injunction is not granted. Beckman's infringing conduct during the pendency of this litigation (1) puts Beckman in direct competition with BD's products and will take away customers; (2) will harm BD's reputation for innovation and brand distinction; and (3) will impair BD's ability to invest in research and development. *See Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm."). These facts amply demonstrate the direct connection between harm suffered by BD and Beckman's infringement of the PI Patents.

#### a. Beckman's SuperNova Dyes Compete Directly with BD's Horizon Brilliant Violet Dyes

"Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013). The Federal Circuit has repeatedly recognized that infringement in direct competition with a patentee "strongly shows a probability for irreparable harm." *Id.*; *see also Trebro Mfg., Inc.*, 748 F.3d at 1171.

That is precisely the case here. With the launch of Beckman's SuperNova line, Beckman and BD are now direct competitors in both the RUO and ASR markets for high brightness polymer dye products. Indeed, Beckman brazenly promotes its SuperNova v428 as a "substitute" for BD's Brilliant Violet 421 and its SuperNova v605 and v786 as "counterpart[s]" to BD's Horizon Brilliant Violet 605 and 786 products. Swager Ex. 4 at 1, 5. In the ASR market, Beckman is BD's *only* competitor for high brightness polymer dyes. Gelhaus Decl. ¶ 30. When the infringer creates a two-player market, "every sale to [the infringer] is essentially a lost sale to [the patentee]," which "also translates into a lost

customer," irreparably injuring the patentee's market share. *Trebro Mfg. Inc.,* 748 F.3d at 1170; *see also Illumina, Inc. v. BGI Genomics Co.*, 2020 U.S. Dist. LEXIS 105080, *34 (N.D. Cal., June 13, 2020)  (granting preliminary injunction where patent owner was primary player in market and defendant's entry into market would create essentially a two-player market); *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 531 (D. Del. 2008); *Novozymes A/S v. Genecor Int'l, Inc.*, 474 F. Supp. 2d 592, 612-13 (D. Del. 2007) ("These are head-to-head competitors, and Novozymes has a right, granted by Congress, not to assist its rival with the use of proprietary technology.") (granting permanent injunction).

The harm to BD is exacerbated by the fact that Beckman ASR customers that begin using Beckman's SuperNova Dyes, in particular third-party clinical diagnostic laboratories developing their own proprietary tests, are unlikely to switch suppliers after investing time and resources to develop and validate their tests based on Beckman's dyes.  *See* Gelhaus Decl. ¶ 29.  Thus, losing ASR business to Beckman is likely to be more harmful to BD and have more long-term impact than merely the loss of a particular reagent sale.  *See Celsis in Vitro, Inc.*, 664 F.3d at 930 (where market was "particularly sensitive" because customers buy in bulk at irregular times, the loss of a single sale may be more harmful than for products purchased daily).

Beckman cannot deny the causal connection between its infringement and the harm to BD's business.  That Beckman is a direct competitor of BD is undisputed.  Further, Beckman expressly markets its infringing polymer dyes for their high brightness and water solubility, the very features of the patented inventions that have driven the success of BD's Horizon Brilliant™ Dyes.  Fiacco Ex. 5; *see also Illumina, Inc.*, 2020 U.S. Dist. LEXIS 105080 at *36-37.

1

### b. Beckman's Continuing Infringement Will Cause Irreparable Reputational Harm

Beckman's infringement threatens BD's reputation for innovation in the flow cytometry market, an enviable reputation that BD has carefully built over decades through substantial investments and superior products. Under Federal Circuit law, the threat of reputational harm for innovation and product distinctiveness can be difficult to quantify, thereby satisfying the irreparable harm requirement and warranting an injunction. *See Douglas Dynamics*, 717 F.3d at 1344 (Fed. Cir. 2013) ("Irreparable injury encompasses . . . erosion in reputation and brand distinction."); *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1208 (Fed. Cir. 2017) (affirming finding of irreparable harm due to "harm to [patentee's] reputation and tarnish[ment of] its status as the innovator in this market").

The testimony of BD executive Kenneth Gelhaus elaborates on BD's hard-earned reputation as an innovator. BD's reputation has been widely recognized, including earlier this year when Clarivate listed BD in its Top 100 Global Innovator's list for the sixth time. Gelhaus Decl. ¶ 13. BD's reputation for innovation extends specifically to the field of flow cytometry and is a key feature of its marketing strategy for BD's Horizon Brilliant Violet dye products. Gelhaus Decl. ¶¶ 14-16. Through BD's acquisition of Sirigen and obtaining of exclusive rights in the Asserted Patents, as well as its subsequent investment in research, development and marketing of its novel polymer dyes, BD has created brand distinction and enhanced its reputation for innovation in the field of flow cytometry.

Beckman's infringement directly threatens that reputation and undermines the huge investment BD has made to maintain its leadership as an innovator. The Federal Circuit's decision in *Douglas Dynamics* is instructive. In that case, the Federal Circuit reversed a district court's denial of injunctive relief where the

infringers' conduct threatened to harm the patentee's reputation for innovation. *Douglas Dynamics*, 717 F.3d at 1344-45.  As in *Douglas*, the record here shows that BD dedicates significant amount of time and money towards marketing and sales, engineering, and research and development.  *See id.* at 1344. Over the years, it has earned itself a reputation in the marketplace as an innovative and trusted supplier of quality products.  *See id.*  As the court further explained, the patented invention would lose some of its distinctiveness and market lure where a competitor contends that its product has "similar features" without noting that those features infringe the patentee's proprietary technology.  *Id*.

The harm to BD's reputation is not compensable by money damages.  *See Douglas Dynamics*, 717 F.3d at 1344; *see also Dominion Res. Inc. v. Alstom Grid, Inc.*, 2016 U.S. Dist. LEXIS 136728 (E.D. Pa. Oct. 3, 2016) ("The value of continued infringement is unknown. Defendant has taken from plaintiff not only this important business, but the recognition of being a technology innovator and the first global supplier of the patented technology, and an unquantifiable amount of business opportunities flowing therefrom. Such harms are not compensable in damages.").

### c.     Loss of Research and Development

The consequences of lost research opportunities cannot be quantified and likewise are irreparable.  *See Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566-67 (Fed. Cir. 1996) (affirming finding of irreparable harm based in part on reductions to research and development activities).  As Mr. Gelhaus explains, BD has invested at least about $100 million dollars in its polymer dye technology to research, develop, launch, and support its BD Horizon Brilliant™ dyes.  Gelhaus Decl. ¶ 23.  This massive investment not only has benefited BD, it also has enhanced scientific research and improved the diagnosis and monitoring of patients in clinical settings across the country.  *Id.*  Researchers have used BD's

Horizon Brilliant dyes to generate accurate and reliable scientific data that are reported in scores of publications.  *Id.*  With diminished revenues as a consequence of Beckman's infringing activities, BD will be hampered in investing in its research and development activities.  *Id.* ¶ 30.  *See Bio-Technology Gen. Corp*, 80 F.3d at 1567.

### C.    Balance of Hardships

The balance of hardships favors BD.  BD will face irreparable injury in the absence of preliminary injunctive relief.  "[M]oney damages alone cannot fully compensate [BD] for these harms."  *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011).  Moreover, "[t]here is no reason to believe that [Beckman] will stop infringing, or that the irreparable harm resulting from [its] infringement will otherwise cease, absent an injunction."  *Id.*  Indeed, in view Beckman's announced plans to launch more SuperNova polymer dyes into the RUO and clinical markets, there is every reason to believe that Beckman intends to continue infringing absent judicial intervention.  Beckman's direct competition against BD's patented products strongly tilts the balance of hardships in BD's favor.  As the Federal Circuit explained in *Bosch*, "requiring [a patent plaintiff] to compete against its own patented invention, with the resultant harms…, places a substantial hardship on [the patent plaintiff]."  *Id*. at 1156.

Beckman cannot claim undue hardship after choosing to produce and market infringing products with knowledge of the Asserted Patents—including the two PI patents.  *See Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to build a business on a product found [likely] to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.").  Any harm Beckman may allege would be "the result of its own calculated risk" to launch its infringing products

"with knowledge of [BD's] patent[s]." *Celsis*, 664 F.3d at 931; *see also* Gelhaus Dec. ¶ 31.

### D.   The Public Interest

The public interest will be served by granting a preliminary injunction in this case. Public policy supports the enforcement of valid patent rights.  "[A]bsent any other relevant concerns . . . the public is best served by enforcing patents that are likely valid and infringed." *Abbott Labs. v. Andrx Pharm., Inc*., 452 F.3d 1331, 1348 (Fed. Cir. 2006).  The patent system is designed to incentivize the kinds of technological investments BD made to develop the BD Horizon Brilliant™ dyes. *See Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) ("[T]he encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude. . . . [T]he patent system provides incentive to . . . continue costly development efforts.") (internal citation and quotation marks omitted).  The public, in turn, has benefitted and will continue to benefit from BD's investments in innovation. *See, e.g., Douglas Dynamics*, 717 F.3d at 1346.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court grant their Motion for Preliminary Injunction.

1    Dated:  June 30, 2021

Respectfully submitted,

2

s/ Barbara A. Fiacco

3    Attorney for the Plaintiffs
     Email: bfiacco@foleyhoag.com

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28