**BEHMER & BLACKFORD LLP**
Timothy S. Blackford (SBN 190900)
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: 858-792-3420

**WILLIAMS & CONNOLLY LLP**
Thomas H. L. Selby* (D.C. Bar No. 468855)
David M. Krinsky* (D.C. Bar No. 978190)
Teagan J. Gregory† (D.C. Bar No. 1019258)
D. Shayon Ghosh (Cal. Bar No. 313628)
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: 202-434-5000
Facsimile: 202-434-5029
* Admitted *pro hac vice*
† *Pro hac vice* application forthcoming

*Attorneys for Defendant Beckman Coulter, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Becton, Dickinson and Company, Sirigen, Inc., and Sirigen II Limited,<br><br>               Plaintiffs,<br><br>v.<br><br>Beckman Coulter, Inc.<br><br>               Defendant. | Case No. 21-cv-1173-CAB-NLS<br><br>**DEFENDANT BECKMAN COULTER, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>**REDACTED PUBLIC VERSION** |

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................i

TABLE OF AUTHORITIES .................................................................iii

BACKGROUND ....................................................................................2

    A.    The Use of Dyes in Flow Cytometry .........................................2

    B.    Polymer Dyes ..............................................................................3

    C.    The PI Patents .............................................................................4

ARGUMENT ..........................................................................................5

I.     PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS. ............6

    A.    The PI Patents Are Invalid as Anticipated and Obvious ....................6

          1.    Xue Anticipates the PI Claims ..........................................7

          2.    Gaylord Anticipates the PI Claims ............................................9

          3.    Obviousness ...........................................................10

    B.    The PI Claims Fail Under Section 112 ...............................................10

          1.    Representative Species .............................................................11

          2.    Common Structural Features .....................................................12

    C.    Beckman Does Not Infringe the PI Patents .........................................13

          1.    The Accused Products Lack an "MU"...................................13

          2.    SuperNova v605 and v786 Fail To Meet the Limitations of $L_1$.....................................................................15

II.    PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM ..................16

    A.    The Parties' Competition Does Not Establish Irreparable Harm .......16

          1.    The parties' dyes compete in a market for both polymer and non-polymer dyes.................................................................16

OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

2.     BD fails to show irretrievably lost customers or market share. ........................................................19

B.    Plaintiffs Have Not Shown Any Effect on BD's Reputation.............21

1.     Beckman's flow cytometry products are well regarded. ..........21

2.     BD cannot tie its allegedly innovative reputation to its dyes. ..................................................................22

C.    There Has Been No Loss of Research and Development Funding.............................................................22

D.    Plaintiffs' Delay and Licensing Defeat the Irreparable Harm Claim. ...............................................................23

1.     Plaintiffs' long delay underscores the lack of irreparable harm. ...................................................23

2.     BD licenses the claimed technology.........................................24

III.   THE BALANCE OF THE EQUITIES FAVORS BECKMAN ...................24

IV.   AN INJUNCTION WOULD BE AGAINST THE PUBLIC INTEREST ............................................................25

CONCLUSION...............................................................25

# TABLE OF AUTHORITIES

## CASES

*Abbott Cardiovascular Sys., Inc. v. Edwards Lifesciences Corp.*,
  2019 WL 2521305 (D. Del. June 6, 2019) .......................................................25

*Abbott Labs. v. Andrx Pharm., Inc.*,
  452 F.3d 1331 (Fed. Cir. 2006) ............................................................... 19, 25

*AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*,
  759 F.3d 1285 (Fed. Cir. 2014) .......................................................................12

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012) .......................................................................16

*Altana Pharma AG v. Teva Pharm. USA, Inc.*,
  566 F.3d 999 (Fed. Cir. 2009) ...........................................................................7

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001) .........................................................................5

*Apple, Inc. v. Samsung Elecs. Co.*,
  678 F.3d 1314 (Fed. Cir. 2012) ...................................................16, 19, 20, 23

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) (en banc) ................................................10, 11

*Automated Merch. Sys. v. Crane Co.*,
  357 F. Appx. 297 (Fed. Cir. 2009) ..................................................................19

*Conceptus, Inc. v. Hologic, Inc.*,
  2012 WL 44064 (N.D. Cal. Jan. 9, 2012)........................................................25

*Cordis Corp. v. Bos. Sci. Corp.*,
  99 F. App'x 928 (Fed. Cir. 2004) ....................................................................25

*CRFD Research, Inc. v. Matal*,
  876 F.3d 1330 (Fed. Cir. 2017) .........................................................................7

*DNA Genotek Inc. v. Spectrum Sols. L.L.C.*,
  2016 WL 8738225 (S.D. Cal. Oct. 6, 2016)....................................................25

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) .................................................................19, 21

OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

*Finjan, Inc. v. Blue Coat Sys., LLC*,
  2016 WL 6873541 (N.D. Cal. Nov. 22, 2016) ..................................................21

*Guntert & Zimmerman Constr. Div., Inc. v. Gomaco Corp.*,
  2020 WL 6948364 (N.D. Iowa Oct. 14, 2020).................................................20

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
  607 F.3d 776 (Fed. Cir. 2010) ........................................................................15

*Hoist Fitness Sytems, Inc. v. Tuffstuff Fitness Int'l, Inc.*,
  2017 WL 5640562 (C.D. Cal. Oct. 31, 2017) ............................................18, 19

*Humanscale Corp. v. CompX Int'l Inc.*,
  2010 WL 1779963 (E.D. Va. Apr. 29, 2010) ...................................................19

*Idenix Pharm. LLC v. Gilead Sci. Inc.*,
  941 F.3d 1149 (Fed. Cir. 2019) ......................................................................12

*In re Fracalossi*,
  681 F.2d 792 (C.C.P.A. 1982) ........................................................................10

*In re Skvorecz*,
  580 F.3d 1262 (Fed. Cir. 2009) ........................................................................6

*In re Vaeck*,
  947 F.2d 488 (Fed. Cir. 1991) ...................................................................11, 12

*Javo Beverage Co. v. California Extraction Ventures, Inc.*,
  2020 WL 886527 (S.D. Cal. Feb. 24, 2020).................................................23, 24

*Merck & Co. v. Teva Pharm. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005) ......................................................................14

*Nichia Corp. v. Everlight Americas, Inc.*,
  855 F.3d 1328 (Fed. Cir. 2017) ......................................................................24

*NuVasive, Inc. v. Alphatec Holdings, Inc.*,
  2018 WL 3361457 (S.D. Cal. July 10, 2018)...............................................20, 21

*Open Text, S.A. v. Box, Inc.*,
  36 F. Supp. 3d 885 (N.D. Cal. 2014).................................................................19

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......................................................14

iv          Case No. 21-cv-1173-CAB-NLS
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
　2015 WL 604582 (N.D. Cal. Feb. 12, 2015) ............................................... 21

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
　875 F.3d 1369 (Fed. Cir. 2017) ............................................................. 24

*Southwall Techs., Inc. v. Cardinal IG Co.*,
　54 F.3d 1570 (Fed. Cir. 1995) .............................................................. 13

*Titan Tire Corp. v. Case New Holland, Inc.*,
　566 F.3d 1372 (Fed. Cir. 2009) ............................................................. 6

*Trebro Mfg., Inc. v. Firefly Equip., LLC*,
　748 F.3d 1159 (Fed. Cir. 2014) ............................................................ 19

*U.S. Philips Corp. v. Iwasaki Elec. Co.*,
　505 F.3d 1371 (Fed. Cir. 2007) ............................................................ 15

*Varex Imaging Corp. v. Richardson Elecs., Ltd.*,
　2019 WL 4750270 (N.D. Ill. Sept. 30, 2019) ...................................... 22

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,
　141 F.3d 1084 (Fed. Cir. 1998) ............................................................. 6

*Winter v. Natural Resources Defense Council*,
　555 U.S. 7 (2008) ................................................................. 5, 16, 24, 25

## STATUTES

35 U.S.C. § 102 ............................................................................................... 6

35 U.S.C. § 102(b) ...................................................................................... 1, 7

35 U.S.C. § 112 ............................................................................. 1, 6, 10, 13

OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs' Motion for Preliminary Injunction tells a tale of how their allegedly inventive, water-soluble conjugated polymer dyes were supposedly stolen by Defendant Beckman Coulter ("Beckman"), and this somehow will harm Plaintiffs' reputation for innovation if it is not stopped.  Unfortunately for Plaintiffs, that tale is a work of fiction.  Plaintiffs did not invent conjugated polymer dyes, were not the first to make such dyes water-soluble, and were not the first to use them to identify biological targets in a sample.  Plaintiffs were not even the first to make conjugated polymer dyes within the scope of their own overbroad patent claims.  And for its part, Beckman is neither a copycat nor a thief.  Beckman has been known as an innovator for decades; the accused products have a novel chemical structure that Beckman invented and is different from, and better than, that of Plaintiffs' dye products.  Plaintiffs' concern should not be of competition from a copycat product, but rather from a novel and superior product, which is precisely what the patent laws encourage.

In reality, Plaintiffs cannot come close to justifying a preliminary injunction.  First, they must show a likelihood of success on the merits.  They must meet a high burden to establish both that there is no substantial question concerning the patent claims' validity and that Beckman likely infringes the patents.  Plaintiffs can do neither.  There is nothing new about the claimed invention.  Every aspect of the claimed polymers was well known in the art, and unsurprisingly, the claims are anticipated by at least two separate prior art references under 35 U.S.C. § 102(b).  Each of those references teaches polymer dyes within Plaintiffs' claims and the use of those dyes to detect biological targets.  Moreover, Plaintiffs' claims are vastly broader than the patents' written description, and therefore also are invalid under 35 U.S.C. § 112.  There is far more than a "substantial question" of invalidity; there is overwhelming evidence of it.  Beckman also does not infringe, because its dyes undisputedly are missing a structural feature of the claims called a "polymer modifying unit," or "MU."  Plaintiffs try to evade this problem by arguing that an MU is merely optional, but this is contrary to the patents' claims and specifications.  Many

other features are expressly denominated as "optional," but MU is not, and interpreting it to be "optional" would improperly strip that term of meaning.  Two of Beckman's accused products also fail to meet a second limitation of the claims.

Plaintiffs also fail to show irreparable harm.  The lynchpin of their irreparable harm argument is the allegation that Beckman and Plaintiff Becton, Dickinson and Company ("BD") are direct competitors in a two-party market.  But that is simply wrong:  the relevant market for dyes is larger than just BD and Beckman ███████ ████████████████████████  The evidence shows that Beckman's limited sales of polymer dyes will *not* irretrievably erode BD's market share or convert its customers.  If, eventually, Plaintiffs somehow manage to establish infringement of a valid patent claim, any sales lost to Beckman plainly would be compensable. Plaintiffs' other theories of irreparable harm equally fail:  their alleged loss of R&D funding is totally unsupported, and their alleged reputational harms are conclusory, ignore Beckman's own reputation for quality and innovation, and have no connection to the accused products.  Put simply, there is no basis for an injunction.

Finally, both the balance of equities and the public interest favor denial of an injunction.  Beckman has a new, innovative product, and it would be unjust to Beckman and harmful for medical consumers and patients to pluck it off the market.  Plaintiffs' request for an injunction should be denied.

## BACKGROUND

### A.    The Use of Dyes in Flow Cytometry

This case is about fluorescent dyes used in flow cytometry, a technique in which a stream of cells is illuminated by light and then fluorescence from the cells is measured as they flow past a detector.  The cells glow when they are labeled with a fluorescent dye, a molecule that emits light at a particular wavelength when exposed to light at a different, shorter wavelength.  One dye might respond to light from a violet-colored laser by emitting orange light.  Other dyes might respond to that same laser by emitting red light, or light that is a different shade of violet, etc.

To make them useful in flow cytometry, dyes are chemically linked to sensor biomolecules like antibodies.  Antibodies can bind to particular proteins, and so the linked molecules, called "antibody-dye conjugates," bind to those proteins too.  In this manner, scientists can attach dyes to biological targets of interest, such as cancer cells that contain different proteins.  When the targets are illuminated by the lasers in a flow cytometer, each target lights up in the particular color associated with the dye that is attached to it.  By adding several different dyes, each linked to a different antibody, to a biological sample and putting the sample in a flow cytometer, scientists can measure the presence of multiple biological targets all at once.

### B.     Polymer Dyes

The dyes that Plaintiffs have accused of infringement—Beckman's SuperNova v428, SuperNova v605, and SuperNova v786—belong to a chemical family of flow cytometry dyes known as polymer dyes.  A "polymer" is simply a substance composed of a large number of repeating units bonded together.  As explained by Dr. Colin Nuckolls, Professor and former Chairman of Columbia University's Chemistry Department, the characteristic chemical feature that distinguishes polymer dyes from other dyes is a backbone chain of repeating units that are "π-conjugated," meaning that the repeating units share electrons with each other.  Decl. of Colin P. Nuckolls, Ph.D. ("Nuckolls") ¶ 22; Decl. of Timothy M. Swager, Ph.D. ("Swager"), Doc. No. 9-2, ¶ 7.  Conjugated polymers may be useful as dyes because they can absorb light efficiently and emit it brightly.  Swager ¶¶ 21-22.

In some such polymers, including Beckman's accused dyes, the polymer backbone consists of a single type of repeating unit, a structure known as a "fluorophore" that can absorb and emit light in the desired way.  Swager ¶¶ 9, 21.  In other dyes, a fluorophore alternates along the polymer backbone with one or more other repeating units.  Nuckolls ¶¶ 26-30.  For example, many polymers in the prior art—and the polymers Plaintiffs have claimed—include repeating units that alter the wavelength of the light that the polymer emits.

OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### C.   The PI Patents

In moving for a preliminary injunction, Plaintiffs assert infringement only of claims 1 and 7 of U.S. Patent No. 10,458,989 ("the '989 patent") and claims 1 and 7 of U.S. Patent No. 10,365,285 ("the '285 patent") (together, "the PI Patents").  These four "PI Claims" encompass a vast genus with the generic chemical structure:

$$G_2 \cdots \left[ \left(\!\!\!\!\begin{array}{c} Ar \end{array}\!\!\!\!\right)_a \!-\! \left(\!\!\!\!\begin{array}{c} Mu \end{array}\!\!\!\!\right)_b \!-\! \left(\!\!\!\!\begin{array}{c} L_1 \end{array}\!\!\!\!\right)_c \!-\! \left(\!\!\!\!\begin{array}{c} L_2 \end{array}\!\!\!\!\right)_d \right]_n \cdots G_1$$

'989 patent at 221:2-59.  Each of the four circles labeled Ar, MU, $L_1$, and $L_2$ above represents one of several repeating units of the polymer (some of which are optional), and the subscripts $a$, $b$, $c$, and $d$ represent each repeat unit's frequency as a percentage. *Id.* at 221:5-7, 55-59.  The subscript $n$ represents the total repeat units.  *Id.* at 221:48.

The first claimed repeat unit is Ar, "an aryl or heteroaryl unit substituted with a non-ionic side group capable of imparting solubility in water."  *Id.* at 221:10-12.  The Ar unit is the "fluorophore" discussed above, which is the structure at the heart of what makes a dye work; it absorbs and emits light.  The name "aryl" and abbreviation "Ar" refer to the fact that the Ar unit is what chemists call an "aromatic group"—a ring or multiple rings of carbon atoms.  Swager ¶ 56.  Other than the requirement that Ar have a non-ionic (uncharged) side group—a branch off the polymer—that imparts solubility, the claim provides essentially no structural or other limitations on "Ar".

The great breadth of this Ar limitation is critical to Plaintiffs' infringement claim, because the fluorophore in Beckman's accused dyes differs materially from anything described in the PI Patents and from BD's own dyes.  In BD's dyes, and in virtually every example in the PI Patents, the fluorophore is a chemical structure called "fluorene."  Nuckolls ¶ 164.  Fluorene was well known for its optical properties and was used in a large number of prior-art polymer dyes.  Nuckolls ¶¶ 22-24.   In Beckman's dyes, by contrast, the fluorophore is at its core an entirely different structure known as dihydrophenanthrene, or DHP, that appears nowhere in the specification of the PI Patents.  Nuckolls ¶¶ 167, 206; *see* Swager Ex. 6.

OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The second claimed repeat unit is MU, "a polymer modifying unit or band gap modifying unit." '989 patent at 221:13-23. The "band gap" is the gap between the absorption and emission wavelengths for a fluorescent dye. Nuckolls ¶ 35. In short, MU determines the color of light the dye emits. The claims (and specification) do not describe the MU as "optional." MU is missing from Beckman's dyes. Swager ¶ 69.

The claims also recite "optional linkers $L_1$ and $L_2$," '989 patent at 221:24-33, and end groups $G_1$ and $G_2$, which form the ends of the polymer and do not repeat, *id.* at 221:34-46. The claim provides possible values of *a*, *b*, *c*, and *d*. *Id.* at 221:55-59.

Claim 7 of the '989 patent depends from claim 1 and additionally requires that the "non-ionic side group comprises an ethylene glycol oligomer," *i.e.*, a particular chemical appendage that is well-known to impart water-solubility. *Id.* at 225:12-14.

Claim 1 of the '285 patent recites a method for using essentially the same polymers recited in claim 1 of the '989 patent to determine whether a target is present in a sample. '285 patent at 217:2-218:9. The claimed method comprises "contacting the sample with a conjugated polymer complex comprising a sensor for the target conjugated to a water soluble conjugated polymer having the structure of the formula" claimed in the '989 patent. *Id.* Claim 7 of the '285 patent depends from claim 1 and includes the same additional limitation as claim 7 of the '989 patent. *Id.* at 221:50-51.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right." *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 24 (2008). Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20. Plaintiffs cannot be granted a preliminary injunction unless they establish *both* of the first two factors, *i.e.,* likelihood of success on the merits and irreparable harm. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

## I.   PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS.

"To establish a likelihood of success on the merits, [Plaintiffs] must show that, in light of the presumptions and burdens that will inhere at trial on the merits, (1) it will likely prove that [Beckman] infringes the [PI Patents], and (2) its infringement claim will likely withstand [Beckman's] challenges to the validity and enforceability of the [PI Patents]." *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1088 (Fed. Cir. 1998). An injunction should not issue if "there is a 'substantial question' concerning the validity of the patent, meaning that the alleged infringer has presented an invalidity defense that the patentee has not shown lacks substantial merit." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1379 (Fed. Cir. 2009). "[I]t is the patentee, the movant, who must persuade the court that, despite the challenge presented to validity, the patentee is likely to succeed at trial[.]" *Id.* at 1377.

BD cannot satisfy either requirement: the claims are neither valid nor infringed. The concepts that the PI Claims recite are so well-known that the claims are not merely obvious, but anticipated by two separate and independent references disclosing polymers within the claims. The claims also are invalid under 35 U.S.C. § 112; the patents do not come close to describing the vast genus of polymers Plaintiffs purport to have patented. Yet despite that breadth, the claims recite certain elements that Beckman's dyes do not contain. The accused products do not infringe because the claimed "MU" is required, not optional—and in Beckman's products, such units are undisputedly absent. Beckman's accused SuperNova v605 and v786 products also lack the required side chain "terminated by" another dye. Plaintiffs cannot possibly show a likelihood of success on the merits, and the PI should thus be denied.

### A.   The PI Patents Are Invalid as Anticipated and Obvious

Plaintiffs are unlikely to prevail on the merits because the PI Claims are anticipated under 35 U.S.C. § 102. As a matter of law, one cannot patent something that "is not new." *In re Skvorecz*, 580 F.3d 1262, 1266 (Fed. Cir. 2009). A patent claim is invalid "if a single prior art reference discloses all limitations of the claimed

invention." *CRFD Research, Inc. v. Matal*, 876 F.3d 1330, 1338 (Fed. Cir. 2017).

There is nothing new about the PI Claims. As Beckman's expert Dr. Nuckolls explains, conjugated polymer dyes have been known for decades. Nuckolls ¶¶ 21-24. There is a wealth of literature describing polymers of fluorene—the PI Patents' preferred fluorophore—including polymers having many of the same "modifying units" that the patents claim and with the same "non-ionic side groups" that render the polymers water-soluble. *Id.* ¶¶ 23-24, 36-37, 41. Even the claimed use for these polymer dyes, the identification of biological targets, was well known. *Id.* ¶ 24.

Unsurprisingly, therefore, there are at least two publications that anticipate the PI Claims: (1) Xue et al., Highly Water-Soluble, Fluorescent, Conjugated Fluorene-Based Glycopolymers with Poly(ethylene glycol)-Tethered Spacers for Sensitive Detection of *Escherichia coli*, Chem. Eur. J. 15:2289-95 (2009), Ex. 2 to Nuckolls Decl. ("Nuckolls Ex.") ("Xue"); and (2) U.S. Patent App. Pub. No. 2008/0293164, Nuckolls Ex. 3 ("Gaylord"). Both references, which are prior art under 35 U.S.C. § 102(b), disclose fluorene polymers within the scope of the claims. Either reference alone would be more than sufficient to show a "substantial question" as to the validity of the PI claims and defeat Plaintiffs' injunction request. *Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1006 (Fed. Cir. 2009).

### 1.   Xue Anticipates the PI Claims

**'989 Patent Claim 1.** As discussed above, claim 1 of the '989 patent recites a water-soluble conjugated polymer with three types of repeat units: (1) Ar, "an aryl or heteroaryl unit substituted with a non-ionic side group capable of imparting solubility in water"; (2) MU, "a polymer modifying unit or band gap modifying unit that is evenly or randomly distributed along the polymer main chain and is optionally substituted"; and (3) "optional linkers $L_1$ and $L_2$." Claim 1 also requires end groups $G_1$ and $G_2$, as well as either one of several "functional group[s]" or "a conjugated organic dye or biomolecule." Claim 1 further recites broad ranges for the abundance of each of the repeat units above. Xue discloses all of the elements.

1    Specifically, Xue (Nuckolls Ex. 2)—which was not considered during

2    prosecution of either of the PI Patents—discloses two water-soluble conjugated

3    polymers, "Polymer B" and "Polymer C," each of which fulfills the limitations of

4    claim 1.  Xue's polymers both have backbone chains comprising fluorene groups

5    alternating with groups called "phenyl" groups (six-membered carbon rings).

6    Nuckolls ¶¶ 65-69.  As Dr. Nuckolls explains, fluorene groups are aryl units (the "Ar"

7    element) within the meaning of claim 1, and the fluorene groups in each of Polymers

8    B and C are substituted with a non-ionic side group that imparts water solubility to the

9    polymers.  *Id.* ¶¶ 71-76.  The phenyl groups in Polymers B and C, meanwhile, are

10   polymer modifying units or band gap modifying units (the "MU" element), because

11   they modify the band gap for the conjugated polymer.  *Id.* ¶¶ 77-80; Tr. of Swager

12   Dep., Ex. 1 to Ghosh Decl. ("Ex.") ("Swager Tr.") at 70.

13   Polymers B and C do not include linkers, but claim 1 undisputedly does not

14   require them.  Nuckolls ¶ 81.  Polymers B and C also have end groups satisfying the

15   claim requirements for $G_1$ and $G_2$—some combination of hydrogen, iodine (a

16   halogen), boronic acid, or boronic ester, each of which is recited in the claims.  *Id.*

17   ¶¶ 82-86.  Xue also discloses that these polymers comprise a "biomolecule":  a

18   conjugated mannose (polymer C) or glucose (polymer B) structure, which are sugars,

19   a class of molecule that the '989 patent describes as biomolecules.  *Id.* ¶¶ 89-90.  And

20   finally, the fluorene groups and phenyl groups in both disclosed polymers each appear

21   at an abundance of 50%, which falls within the claimed ranges for Ar and MU

22   respectively.  *Id.* ¶¶ 91-95.  Xue therefore anticipates claim 1 of the '989 patent.

23   ***'285 Patent Claim 1.***  Claim 1 of the '285 patent, discussed above, recites a

24   "method of determining whether a target is present in a sample."  Claim 1 recites that

25   the method comprises "contacting the sample with a conjugated polymer complex

26   comprising a sensor for the target conjugated to a water-soluble conjugated polymer

27   having the structure of the formula" recited in claim 1 of the '989 patent.  Xue teaches

28   these limitations.  Xue describes contacting a sample with Polymer C, which

1  comprises mannose—a sensor for certain bacteria—conjugated to a water-soluble

2  conjugated polymer.  *Id.* ¶¶ 101-02.  As described above, Xue's Polymer C has the

3  structure of the claimed formula; it also meets the added *n* limitation.  *Id.* ¶¶ 103-10.

4      ***Dependent Claims.***  Xue also anticipates claim 7 of the '989 patent and claim 7

5  of the '285 patent, because the side groups attached to Xue's fluorene groups

6  comprise ethylene glycol oligomers and are capable of imparting solubility in water,

7  as each of those claims requires.  *Id.* ¶¶ 96-98, 111-13.

8  ## 2. Gaylord Anticipates the PI Claims

9      Gaylord is Plaintiffs' own prior patent application—a published application that

10  was assigned to Plaintiff Sirigen, Inc., and lists as inventors many of the named

11  inventors of the PI Patents.  *See* Nuckolls Ex. 3.  Gaylord appears to relate to earlier

12  work on polymer dyes performed by Sirigen, but the PI Claims are so broad that they

13  encompass polymers that the Gaylord patent application already disclosed to the

14  public.  Nuckolls ¶ 114.  Gaylord therefore anticipates the PI Claims.

15      ***'989 Patent.***  Like the PI Patents, Gaylord relates to polymers that are

16  conjugated to a "sensor" that is used to detect a target in a biological sample.  *Id.*

17  ¶ 115.  Gaylord discloses a wide range of suitable conjugated polymers, including, as

18  relevant here, various water-soluble conjugated polymers.  *Id.* ¶ 116.  In particular,

19  Gaylord discloses a class of conjugated polymers with a backbone chain comprising

20  fluorene groups alternating with other aromatic groups, including phenyl.  *Id.* ¶¶ 118-

21  20.  As discussed above with respect to Xue, a fluorene group is an aryl unit ("Ar"),

22  and a phenyl group is a polymer modifying unit or band gap modifying unit ("MU").

23  *Id.* ¶¶ 121-23.  Gaylord further discloses that the fluorene groups are substituted with

24  "ethylene glycol oligomers," which are non-ionic solubility side groups.  *Id.* ¶ 121.

25      Gaylord discloses some polymers without the optional linkers, and others with

26  repeating units that satisfy the $L_1$ limitation.  *Id.* ¶¶ 124-125.  The conjugated

27  polymers disclosed in Gaylord have bromine, boronic acid, or hydrogen end groups,

28  satisfying the $G_1$ and $G_2$ requirements.  *Id.* ¶ 126.  Gaylord also discloses polymers

OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

comprising conjugated biomolecules as well as maleimide.  *Id.* ¶¶ 128-129.  Finally, Gaylord discloses that the fluorene groups and phenyl groups (as well as the linkers, where present) are present at abundances that fall within the claimed ranges for Ar, MU, and L$_1$.  *Id.* ¶¶ 130-132.  Gaylord therefore anticipates claim 1 of the '989 patent.

**'285 Patent.**  As discussed, Gaylord teaches a polymer that is conjugated with a sensor such as an antibody.  *Id.* ¶ 137.  Gaylord further discloses contacting a sample with such a conjugate to detect the presence of the target of the antibody in the sample.  *Id.* ¶ 138.  And as described above for the '989 patent, Gaylord teaches polymers with the claimed structure; it also meets the limitation on *n*.  *Id.* ¶¶ 139-146.

**Dependent Claims.**  Gaylord further discloses that the non-ionic side groups may be ethylene glycol oligomers, so Gaylord anticipates claim 7 of the '989 patent and claim 7 of the '285 patent.  *Id.* ¶¶ 133-34, 147-49.

### 3.  Obviousness

"Anticipation is the epitome of obviousness," *In re Fracalossi*, 681 F.2d 792, 794 (C.C.P.A. 1982), and both Xue and Gaylord thus also render the invention obvious.  But given these references and the other myriad disclosures of all of the supposedly inventive features of the claimed dyes and methods, there is a substantial question of invalidity, and no injunction should issue, even if Plaintiffs somehow were to overcome Beckman's anticipation defenses.  Nuckolls ¶¶ 150-51.

### B.  The PI Claims Fail Under Section 112

The PI Claims are invalid for another independent reason: they lack adequate written description support, and their full scope is not enabled, under 35 U.S.C. § 112.

As discussed, the claims here "define the boundaries of a vast genus of chemical compounds."  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1349 (Fed. Cir. 2010) (en banc).  The polymers of the PI Claims are structurally almost boundless.  Ar can be any of a huge number of different "aromatic" ring structures, so long as it is substituted with a functionally-defined "non-ionic side group capable of imparting solubility in water."  Nuckolls ¶¶ 158-86; Swager Tr. 45-47, 55-56.  MU,

referred to simply as a "polymer modifying unit or band gap modifying unit," conveys no structural information whatsoever; it may be "optionally substituted" with certain structures, but that is optional.  Dr. Swager opined, in fact, that MU was defined based on its intended function.  Swager Tr. 69-71.  And on top of this, the claims also may contain optional linkers that are similarly broadly defined.  Nuckolls ¶ 162.  These various monomer units may be combined in virtually any way, with MU (and linkers) either "evenly" or "randomly distributed along the polymer main chain."  The claims encompass innumerable compounds, numbering at least in the billions.  *Id.*

The law requires, however, that a patent's written description "demonstrate[] that the [patentee] has invented species sufficient to support a claim to a genus." *Ariad.*, 598 F.3d at 1349.  The patentee can do so by disclosing: "[1] a representative number of species falling within the scope of the genus or [2] structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' members of the genus." *Id.* at 1350.  Plaintiffs have done neither.  Nor would the patents enable the person of ordinary skill in the art ("POSA") "to practice the broad scope of the claimed invention," or indeed determine which polymers "possess the disclosed utility" as dyes, without undue experimentation.  *E.g.*, *In re Vaeck*, 947 F.2d 488, 493, 496 (Fed. Cir. 1991).

### 1.  Representative Species

Given the tremendous breadth of the claims, the PI Patents do not come close to disclosing representative species that could provide written description support.  As to Ar, the specification illustrates *only two* possibilities, which are not commensurate with all "aryl or heteroaryl" groups.  Nuckolls ¶¶ 164-65.  Nearly all polymers disclosed in the patent, including *all eleven* of the numbered Formulas advanced as preferred embodiments, contain one of those possibilities—the well-known fluorene monomer.  *Id.* ¶ 164.  These paltry disclosures do not come close to describing the invention of an essentially limitless number of Ar moieties.  *Id.* ¶ 167.  And in addition, the claims have a functional requirement—which in some cases will be more

1   challenging to meet than in the disclosed examples—of side chains that confer water
2   solubility.  *Id*. ¶¶ 174-86.

3       The PI Patents do better for MU, but not by much.  The PI Patents exemplify
4   eleven possible MU groups, and dependent claims 2-6 identify several others.  *Id*.
5   ¶ 160.  By contrast to that limited set of examples, the PI Patents claim literally *any*
6   structure of MU; "MU" is defined purely functionally.  *Id.*

7       Putting these ill-defined Ar and MU genera together yields billions of
8   compounds, even before considering the optional linkers.  *Id.* ¶ 162.  Plaintiffs could
9   have sought narrower claims, but instead tried to capture the field—including its
10  current attempt to cover polymers like Beckman's that have a repeating unit (Ar) that
11  the patent nowhere mentions and there is no evidence the inventors ever envisioned.
12  To the extent that any disclosure could support such vast claims, it is not this one.
13  The specification must go beyond "drawing a fence around a perceived genus"; it
14  must "describe[] sufficient representative species encompassing the breadth of the
15  genus."  *AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285,
16  1300 (Fed. Cir. 2014).  Just two possibilities for Ar cannot possibly suffice.  *See id.*
17  (disclosure of over 200 antibodies of same type could not support claims).

18                    **2.  Common Structural Features**

19      The patents' shared specification also does not disclose common structural
20  features of the claimed genus.  "A written description of an invention involving a
21  chemical genus, like a description of a chemical species, 'requires a precise definition,
22  such as by structure, formula, [or] chemical name' of the claimed subject matter
23  *sufficient to distinguish it from other materials*."  *Idenix Pharm. LLC v. Gilead Sci.*
24  *Inc.*, 941 F.3d 1149, 1164 (Fed. Cir. 2019) (emphasis added).  Here, however, the
25  generic structure is just too vague.  As discussed, Ar and MU are so poorly defined
26  that two polymers within the putative genus may have almost no structural features in
27  common.  Nuckolls ¶¶ 169-71.  Nor is the patent limited to an alternation of Ar, MU,
28  and linker units; the patent is explicit that they may be distributed "evenly or

1  randomly" in a wide range of proportions, and under Plaintiffs' interpretation of the

2  claims, there need not even be an MU at all. *Id.* ¶ 171. And beyond the scattered

3  examples, there is almost no guidance about which combinations of Ar and MU, in

4  which proportions, are useful as dyes (or indeed any purpose). *Id.* ¶ 173. Not every

5  polymer within the genus of possible Ar and MU units is usable (or indeed even

6  water-soluble, as the claims require), but Plaintiffs have failed to identify any common

7  (never mind inventive) structural feature of those that are. *Id.* ¶¶ 173-86.

8    Plaintiffs described a limited number of polymer dyes, almost all based on

9  fluorene. From this, they claimed a vast genus, apparently to encompass water-

10  soluble polymer dyes with other structures that others in the future might invent. That

11  is exactly what the written description requirement is intended to prevent.

12  Furthermore, the same overbreadth means that the full scope of the genus is not

13  enabled; the POSA would have to perform undue experimentation to identify, much

14  less make and use, the full scope of the genus. *Id.* ¶ 173. There is, at a minimum, a

15  substantial question as to whether the PI Claims are valid under 35 U.S.C. § 112.

16    **C.    Beckman Does Not Infringe the PI Patents**

17    Plaintiffs also fail to prove literal infringement, which is all they alleged in their

18  motion. Plaintiffs must show that "every limitation set forth in a claim" is "found in

19  an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d

20  1570, 1575 (Fed. Cir. 1995). Plaintiffs fail to meet this burden in at least two respects.

21    **1.    The Accused Products Lack an "MU"**

22    First, Plaintiffs cannot show that any of the accused products infringe any of the

23  PI Claims because every claim requires the polymer to contain a chemical structure

24  called a "polymer modifying unit or band gap modifying unit," or "MU." Plaintiffs

25  concede that none of the accused products contains an "MU." Br. at 10. The question

26  is one of claim construction—an interpretive issue that Beckman's invalidity defenses

27  above do not implicate. Plaintiffs contend that MU is optional. The plain language of

28  the claims and specification, however, indicates that it is not.

1    The claim construction inquiry begins with the claim language.  *Merck & Co. v.*
2  *Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005).  The structure depicted
3  in the claims has four repeating units, Ar, MU, $L_1$, and $L_2$.  Two of those units are
4  expressly described as "optional":  "optional linkers $L_1$ and $L_2$."  MU, in contrast, is
5  *not* specified as optional.  The POSA, from whose perspective claims are interpreted,
6  would thus read the claims to mean that MU is indeed not optional.  Nuckolls ¶¶ 189-
7  193.  The specification is similarly scrupulous in its use of the term "optional."  *Id.* ¶
8  196.  This is not surprising:  the POSA would understand that MU plays an important
9  role in determining the wavelengths of light that the claimed polymers emit.  *Id.*

10    The dependent claims of the '989 patent provide more evidence that unlike the
11 linkers, MU is not optional.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-15 (Fed.
12 Cir. 2005) (en banc) (noting that the structure of dependent claims can provide
13 powerful evidence regarding the construction of independent claims).  Here, the
14 dependent claims expressly acknowledge that $L_1$ and $L_2$ may be absent, but treat MU
15 differently.  Claim 13 of the '989 patent recites that "$L_1$ and/or $L_2$ *are present*,"
16 confirming the patentee's recognition that in claim 1 they might be absent.  Claims
17 14-16 then depend from claim 13 and narrow the structure of $L_1$ and $L_2$.  In contrast,
18 claims 3-6 depend from claim 1 and narrow the structure of MU without an analogous
19 limitation reciting that MU is present.  The implication is that MU is *already present*,
20 *i.e.*, by virtue of it not being "optional" in claim 1.  Nuckolls ¶¶ 194-195.

21    Plaintiffs' argument to the contrary focuses on the claimed range of molar
22 percentages for MU.  The claims specify that $b$, the percentage of the repeating units
23 that are MU, can range from "0 to 90%."  '989 patent at 221:55-59.  Plaintiffs reason
24 that because 0% is an endpoint of this range, $b$ can be 0%, in which case there is no
25 MU.  Br. at 10.  Thus, they reason, MU is optional.  *Id.*

26    The trouble for Plaintiffs is that this ignores—and renders meaningless—the
27 inventors' use of "optional" to describe elements that are, in fact, optional.  For
28 example, under Plaintiffs' reading, there was no need for the inventors to describe

(almost 30 times) the linkers as "optional" because the percentages recited for $L_1$ and $L_2$—$c$ and $d$, respectively, which range from 0% to 25%—would make *them* optional, too. '989 patent at 221:58-59; Nuckolls ¶ 198. This would mean that the word "optional" in the claim and throughout the specification has no meaning, and is simply surplusage. Plaintiffs' expert Dr. Swager, admitted as much; even with "optional" stricken from the claim, he opined that $L_1$ and $L_2$ "could or could not be in the polymer." Swager Tr. 78-79. Such a construction is inconsistent with the mandate to "construe claims with an eye toward giving effect to all of their terms." *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 781 (Fed. Cir. 2010).

There is no need to read the word "optional" out of the claims, either. The specification of the patents explains how to interpret "0 to 90%" to give meaning to the word : "[t]he upper and lower limits of any range can independently be included in *or excluded from* the range." '989 patent at 37:3-7 (emphasis added). The use of the word "optional" to describe $L_1/L_2$ but not MU would inform the POSA that the range of MU *excludes* 0%. Nuckolls ¶ 200. Alternatively, even if 0% is included, a lengthy polymer may have a small amount of MU that rounds down to 0%. *See U.S. Philips Corp. v. Iwasaki Elec. Co.*, 505 F.3d 1371, 1377 (Fed. Cir. 2007); Nuckolls ¶ 201.

In short, the claimed range of "0 to 90%" does not make MU optional. Because MU is not optional but is absent from the accused products, they do not infringe.

### 2. SuperNova v605 and v786 Fail To Meet the Limitations of $L_1$

Beckman does not infringe with respect to its SuperNova v605 and v786 dyes for a second, independent reason: the accused "optional linker $L_1$" does not meet the claim limitations for $L_1$. The SuperNova v605 and v786 are "tandem" dyes, meaning that some of their repeating units have been modified to attach additional chemical structures—other, non-polymer dyes called "acceptor dyes." Nuckolls ¶ 203. Plaintiffs allege that those units meet the "$L_1$" (rather than "Ar") limitation. Br. at 11.

The trouble for Plaintiffs is that when an optional $L_1$ is present, it must be "substituted with one or more pendant chains, *terminated with*" one of a functional

group, organic dye, or biomolecule." '989 patent at 221:24-33 (emphasis added). The units Plaintiffs call $L_1$ have an "organic dye" attached to a "pendant chain." But the acceptor dye is attached to a chemical structure *near the base* of the pendant chain. Nuckolls ¶¶ 204-208. The chain concededly is "terminated with a methyl group"— not with the dye (or any of the other structures) required by the claims. Swager Tr. 57-58, 65-66; Swager ¶ 71; Nuckolls ¶¶ 209-213. Plaintiffs and their expert Dr. Swager simply ignore the "terminated with" limitation, and therefore cannot (and do not) show infringement.

## II.      PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM

Independently of the lack of likelihood of success, Plaintiffs also fail to "make a clear showing that [they are] at risk of irreparable harm, which entails showing a likelihood of substantial and immediate irreparable injury." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1325 (Fed. Cir. 2012) (quotations omitted). Purely economic harms like the ones here, compensable by money damages, are not irreparable. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1338 (Fed. Cir. 2012). Nor may the alleged injury be speculative or remote; the mere "possibility of irreparable harm" is insufficient. *Winter*, 555 U.S. at 22. Plaintiffs also entirely fail to account for their delay in seeking an injunction and their history of licensing, both of which sharply undercut their claims of irreparable harm.

### A.      The Parties' Competition Does Not Establish Irreparable Harm

Plaintiffs' lead argument is that because Beckman and BD compete head-to-head in the polymer dye market, Beckman's supposed infringement irreparably harms BD. Br. at 15-16. Plaintiffs are wrong that that the relevant market is a two-party market for polymer dyes, and wrong that the parties' competition would establish irreparable harm even if Plaintiffs correctly described that competition.

#### 1.      The parties' dyes compete in a market for both polymer and non-polymer dyes.

There is no such thing as a "polymer dye market." As confirmed both by Dr.

Mario Koksch, M.D., Ph.D., General Manager of Beckman's Flow Cytometry business unit, and by Dr. Olga Weinberg, M.D., a hematopathologist with the University of Texas Southwestern Medical Center, the domestic flow cytometry reagent market is diverse, involving numerous competitors and products.  Declaration of Mario Koksch ("Koksch") ¶¶ 12, 18; Declaration of Olga Weinberg ("Weinberg") ¶¶ 16-19.  Beckman competes with BD in both research and clinical reagents, but it also competes in these areas with a host of other manufacturers that offer flow cytometry reagents.  Koksch ¶ 12; ███████████████████████████████ ████████████████████████  The U.S. market leader in research reagents, in fact, is BioLegend.  Koksch ¶ 12; ███████████████████████████████

Choosing which dyes to use, moreover, requires balancing numerous considerations, and there is often no one "right" choice of reagent.  Weinberg ¶¶ 16-19, 29-30, 43; Koksch ¶ 17.  As ████████████████ clinicians choose dyes for a panel based on a number of factors, most important of which is the marker they are evaluating.  Weinberg ¶¶ 14, 17-18, 29; Koksch ¶¶ 17; ███████████████.  Additional considerations include what other targets are being assessed, the other reagents to be used, the type and configuration of the cytometry instrument, the cost and availability of the candidate reagents, any pre-existing relationships with the manufacturers of the candidate reagents, and customer familiarity and personal preference.  Weinberg ¶¶ 17-18; Koksch ¶¶ 17.  Customers therefore do not simply choose to use a polymer dye and then choose which one to use.  Rather, Beckman's accused SuperNova polymer dyes will compete not only with some of BD's Horizon Brilliant dyes (and with the polymer dyes marketed by Thermo Fisher and BioLegend), but also with many of the other non-polymer dyes on the market.  Weinberg ¶¶ 27-43; Koksch ¶¶ 12, 18-21; █████████████████████  Nor does the "brightness" of polymer dyes elevate them to a separate market; each dye must fit with the overall panel, and high brightness can present disadvantages as well as advantages.  Weinberg ¶¶ 27-43; Koksch ¶¶ 15, 17-21.

The diversity of the competitive landscape is reflected in numerous dye selection guides that make clear the Horizon Brilliant dyes can be substituted with non-polymer competitors, several of which Dr. Weinberg describes.  Weinberg ¶¶ 36-41.  For example, Penn State's guide provides a menu of "fluorochrome and dye choices" researchers could choose for use with a 405 nm violet laser with a 450 nm detection filter on a certain BD cytometer.  *Id.* ¶ 38.  The selection guide lists one of BD's Horizon Brilliant polymer dyes, BV421, alongside non-polymer dyes Pacific Blue, Alexa Fluor 405, eFluor 450, and BD Horizon Violet V450.  *Id.*  BD's *own* publications, as well as those of other manufacturers, also confirm that polymer and non-polymer dyes compete with each other.  *Id.* ¶¶ 39-41 (discussing BD and Miltenyi publications); Koksch ¶ 21 (discussing Beckman publication).

In contrast, the only evidence Plaintiffs muster in support of their narrow market definition is a single paragraph of the declaration submitted by Mr. Gelhaus, Br. at 15 (citing Decl. of Kenneth Gelhaus, Doc. No. 9-6 ("Gelhaus") ¶ 30), ███████ ████████████████████████████████████████████████████████████████ ████████.  Yet even Mr. Gelhaus admitted in deposition that ████████████████ ████████████████████████████████████  His declaration carefully avoids the question of the market definition; it merely states that "prior to" Beckman's launch of the "SuperNova dyes, BD was the exclusive manufacturer and seller of high brightness polymer ASR dyes."  Gelhaus ¶ 30.  This notably says nothing about the degree of competition the Horizon Brilliant dyes face from non-polymer dye alternatives.  That competition is substantial, and ██████████████████████ ██████████  This case is thus similar to *Hoist Fitness Sytems, Inc. v. Tuffstuff Fitness Int'l, Inc.*, 2017 WL 5640562 (C.D. Cal. Oct. 31, 2017), where the court rejected an argument that similarities between patented and accused products sufficed to establish the existence of a two-player market where other, dissimilar products "may nevertheless compete with them."  *Id.* at *4.  Plaintiffs here, as in *Hoist Fitness*, have failed to present evidence that consumers "simply disregard" the other competitors'

OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1    products.  *Id.*  This same reasoning applies here to defeat Plaintiffs' Motion.

2          **2.**      **BD fails to show irretrievably lost customers or market share**.

3         Even were Plaintiffs correct in their description of the marketplace, they cannot

4    show irreparable harm.  To begin with, Plaintiffs are wrong to suggest that the fact

5    that "[w]ith the launch of Beckman's SuperNova line, Beckman and BD are now

6    direct competitors," Br. at 15, suffices to show irreparable harm.  The Federal Circuit

7    routinely has rejected findings of irreparable harm, despite the parties being in direct

8    and fierce competition, for the simple reason that most lost sales are compensable, and

9    therefore not irreparable, harms.  *See, e.g.*, *Abbott Labs. v. Andrx Pharm., Inc.*, 452

10   F.3d 1331, 1347-48 (Fed. Cir. 2006); *Automated Merch. Sys. v. Crane Co.*, 357 F.

11   Appx. 297, 301 (Fed. Cir. 2009); *see also Apple Inc.*, 695 F.3d at 1374.

12        The authority cited by Plaintiffs is not to the contrary.  Plaintiffs rely heavily on

13   *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336 (Fed. Cir. 2013), and

14   *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159 (Fed. Cir. 2014), but those

15   cases stand only for the unremarkable proposition that movants generally will have an

16   easier time demonstrating the requisite injury when the plaintiff actually sells into the

17   relevant market.  717 F.3d at 1345; 748 F.3d at 1170-71.  They certainly do not

18   suggest that head-to-head competition is dispositive of the irreparable harm inquiry,

19   which "would essentially create a presumption in favor of irreparable harm, contrary

20   to the Supreme Court's directive in *eBay*."  *Humanscale Corp. v. CompX Int'l Inc.*,

21   2010 WL 1779963, at *3 (E.D. Va. Apr. 29, 2010).

22        No doubt recognizing this deficiency in their lead argument, Plaintiffs pivot

23   quickly to an argument that "[w]hen the infringer creates a two-player market, 'every

24   sale to [the infringer] is essentially a lost sale to [the patentee],' which 'also translates

25   into a lost customer,' irreparably injuring the patentee's market share."  Br. at 15-16.

26   But while the presence of direct competition can hold more weight where the plaintiff

27   and defendant are the only players in a two-party market, *see, e.g.*, *Open Text, S.A. v.

28   Box, Inc.*, 36 F. Supp. 3d 885, 906 (N.D. Cal. 2014); *Humanscale*, 2010 WL 1779963,

1 at *3, not every dye product sale by Beckman represents a customer lost to BD.

2   First, because Beckman is an established seller of dye conjugates, there is no

3 reason to assume the sales of its accused products will cut into BD's market share.

4 *See, e.g.*, *Guntert & Zimmerman Constr. Div., Inc. v. Gomaco Corp.*, 2020 WL

5 6948364, at *9 (N.D. Iowa Oct. 14, 2020).  Beckman may just as easily be moving its

6 own existing customers from its older products to its new, accused products.  *See id.*

7 Plaintiffs provide no basis to doubt that this latter scenario is more likely.  Beckman

8 markets a large number of non-polymer dye conjugates, including conjugates that can

9 be used with the same violet laser as the recently introduced SuperNova dyes.  ███

10 ████████████████████████████████████████████████████████████

11 ██████████████████████████████ *see also* Koksch ¶ 19.

12   Second, Beckman has ██████████████████████████

13 Koksch ¶ 16, in contrast to ████████████████████████████

14 ██████████████████████████ Such "numbers simply

15 do not demonstrate a substantial, ongoing and irretrievable move by [a patentee's]

16 customers to [an accused infringer's product], despite [a patentee's] dire

17 characterizations."  *NuVasive, Inc. v. Alphatec Holdings, Inc.*, 2018 WL 3361457, at

18 *9 (S.D. Cal. July 10, 2018); *see also Apple*, 678 F.3d at 1324-25.  On these facts, BD

19 cannot show that it stands to lose customers in some irreversible manner.

20   Third, Plaintiffs fail to support their contention that "third-party clinical

21 diagnostic laboratories developing their own proprietary tests, are unlikely to switch

22 suppliers after investing time and resources to develop and validate their tests based

23 on Beckman's dyes."  Br. at 16 (citing Gelhaus ¶ 29).  This is speculative attorney

24 argument—the cited Gelhaus Declaration speaks only to the work required "to

25 develop and validate" laboratory-developed tests (LDTs).  Gelhaus ¶ 29.  It says

26 nothing about how customers will behave if the SuperNova dyes are permitted to

27 remain on the market during this litigation.  *Id.*

28   Mr. Gelhaus is silent on that point for good reason—Plaintiffs' argument is

1   nonsensical.  In BD's hypothetical scenario in which their preliminary injunction

2   request is denied but the SuperNova dyes ultimately are found to infringe valid patents

3   and removed from the market, the laboratories that have purchased SuperNova ASRs

4   will have *no choice* but to switch dyes—the SuperNova products will no longer be

5   available.  Nor is there any reason to believe that (in this hypothetical) the investment

6   a laboratory has made in developing tests using a SuperNova dye would make it

7   "unlikely to switch suppliers" generally.  LDTs are component specific, and the work

8   done to develop an LDT incorporating a particular SuperNova reagent cannot simply

9   be applied to different Beckman dyes.  Koksch ¶ 7; ███████████████

10      **B.   Plaintiffs Have Not Shown Any Effect on BD's Reputation.**

11      Plaintiffs next argue that "Beckman's infringement threatens BD's reputation

12   for innovation in the flow cytometry market."  Br. at 17.  Though "damage to

13   reputation" can be a "valid ground[] for finding irreparable harm," *NuVasive*, 2018

14   WL 3361457, at *8, there are several fatal flaws with Plaintiffs' contention here.

15      **1.   Beckman's flow cytometry products are well regarded.**

16      As an initial matter, courts generally credit such reputational injury arguments

17   in patent infringement cases only where the defendant or its accused products are

18   considered inferior or second-rate alternatives to the patentee and its own products.

19   *See, e.g.*, *Finjan, Inc. v. Blue Coat Sys., LLC*, 2016 WL 6873541, at *6 (N.D. Cal.

20   Nov. 22, 2016); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2015

21   WL 604582, at *5 (N.D. Cal. Feb. 12, 2015).  Only in those scenarios is there a risk

22   that similarities between patented and accused products might "actually *hurt* [the

23   patentee's] reputation by, for example, causing consumers to think that [the

24   patentee's] technology is of lower quality."  *Finjan*, 2016 WL 6873541, at *6.  Those

25   were the facts in the *Douglas Dynamics* decision on which Plaintiffs rely, Br. at 17-

26   18—the accused infringer's "products [were] considered less prestigious

27   and innovative" than the patentee's, 717 F.3d at 1344-45.

28      Here, however, no such reputation gap exists—Beckman is widely regarded as

21      Case No. 21-cv-1173-CAB-NLS

an industry leader, including in the flow cytometry market.  Koksch ¶¶ 10-13; Weinberg ¶ 45.  Not only did one of Beckman's namesakes discover the method on which flow cytometry is based, but the company still today is routinely recognized for its ongoing contributions to the field, as it continues research efforts to introduce cutting-edge flow cytometry products to its customers. *See* Koksch ¶ 13.

### 2.     BD cannot tie its allegedly innovative reputation to its dyes.

Plaintiffs' reputation argument also fails because Plaintiffs cannot—and do not even seriously attempt to—link BD's supposed reputation for innovation to the PI Patents.  "[F]or infringement to cause [the requisite] reputational harm, the patents at issue must involve the features or qualities that create the reputation as an innovator amongst consumers."  *Varex Imaging Corp. v. Richardson Elecs., Ltd.*, 2019 WL 4750270, at *5 (N.D. Ill. Sept. 30, 2019).  The evidence Plaintiffs marshal in support of their reputation argument, however, demonstrates at best that BD *generally* might be viewed as innovative.  Even if Plaintiffs' self-serving evidence (*see* Gelhaus ¶¶ 13-16) were sufficient to establish a "reputation for innovation," it does not speak to BD's reputation in flow cytometry reagents, let alone tie any such reputation to the polymer dye technology at issue here—unsurprisingly, since Sirigen (not BD) made the claimed inventions.  Gelhaus ¶¶ 18-20.  BD's supposed reputation as a reagent innovator is supported only in one paragraph of the Gelhaus Declaration touting BD's *decades-old* achievements in this market, *none more recent than 2003.  See id.* ¶ 16.

### C.     There Has Been No Loss of Research and Development Funding.

Plaintiffs' final irreparable harm argument is that "[w]ith diminished revenues as a consequence of Beckman's infringing activities, BD will be hampered in investing in its research and development activities."  Br. at 19.  But the Gelhaus Declaration—once again Plaintiffs' sole source—says no such thing.  Mr. Gelhaus states only that "BD has made substantial investments in its polymer dye technology," that "[t]hese investments are paid for by the profits generated" through BD's sales, and that "the business case for BD's continued investment in that technology will be

weakened" if infringement is permitted.  Gelhaus ¶ 32.  Mr. Gelhaus notably makes *no* claim that BD has suffered or will suffer such severe financial losses that its research and development programs will be constrained.

This again is not surprising.  BD is a Fortune 500 company with over $17 billion in annual revenue. ███████████████  Its cytometry reagents business accounts for ███████████████████████ of that figure. ██████  Even were Beckman taking substantial market share from BD in this narrow sector ██████ ██████████████████████, there would be no reason to believe that lost revenue would affect BD's research activities.  Mr. Gelhaus thus could not credibly argue that BD will see its research programs harmed in the absence of an injunction.

███████████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████████████████

### D. Plaintiffs' Delay and Licensing Defeat the Irreparable Harm Claim.

For the reasons discussed above, each of Plaintiffs' irreparable harm arguments fails.  This alone dooms the Motion, as it is Plaintiffs' burden to demonstrate a "likelihood of substantial and immediate irreparable injury."  *Apple*, 678 F.3d at 1325.  But at least two additional points—ignored by Plaintiffs—compel the same result.

### 1. Plaintiffs' long delay underscores the lack of irreparable harm.

If there were any doubt that Beckman's limited sales of its SuperNova dyes will not cause Plaintiffs irreparable harm, Plaintiffs' pre-suit conduct resolves the question.  "[D]elay in seeking a preliminary injunction weighs against a finding of irreparable harm."  *Javo Beverage Co. v. California Extraction Ventures, Inc.*, 2020 WL 886527, at *5 (S.D. Cal. Feb. 24, 2020) (four-month delay filing suit).  Plaintiffs admit that they waited *at least* four months to file suit and seek injunctive relief.  Br. at 8.  In fact, the delay appears to have been much longer.  Beckman unveiled plans for its

1   SuperNova dyes, including their chemical structure, in a poster at a popular industry

2   conference in *June 2019*.  Swager Ex. 7; ██████████ Br. at 8.  ████████

3   ████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████

5   ████████████████████   It would defy reason to think BD was unaware

6   of Beckman's 2019 conference poster.  ████████████████████

7   ████████████████████████   Plaintiffs then waited *two years* to

8   seek an injunction.  Plaintiffs' lengthy delay in filing suit here was at least as long as

9   the delay in *Javo Beverage* that this Court found "weigh[ed] heavily against a finding

10  of irreparable harm," 2020 WL 886527, at *5, and it is just as revealing.

## 2.   BD licenses the claimed technology.

12  BD's licensing ██████████ further undercuts its claims of irreparable

13  harm, as it reflects a willingness to allow certain actors to undertake what would be

14  infringing activity for agreed-upon monetary compensation.  *See, e.g.*, *Presidio*

15  *Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1383 (Fed. Cir. 2017);

16  *Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328, 1343 (Fed. Cir. 2017).  Here,

17  BD licenses at least two competitors—BioLegend and Thermo Fisher (Life

18  Technologies)—to market polymer dyes, ██████████████████████

19  ████████████████████████████████████████████████████

20  ██████████████████████████████████

21  ████████████████████████████████████████

22  ██████████████████████████████   This

23  licensing seriously undermines the irreparable harm claim, demonstrating that any

24  losses are entirely ████████████████████ compensable.

## III.   THE BALANCE OF THE EQUITIES FAVORS BECKMAN

26  Plaintiffs also must establish "that the balance of equities tips in [their] favor."

27  *Winter*, 555 U.S. at 20.  BD argues that "'requiring [a patent plaintiff] to compete

28  against its own patented invention, with the resultant harms . . ., places a substantial

hardship on" it.  Br. at 19.  One flaw in Plaintiffs' argument, of course, is that, for the reasons explained in Section I above, the SuperNova dyes do not infringe any valid patents and cannot be considered BD's "own patented invention."

In any case, the equities here strongly favor Beckman.  Instead of seeking an injunction months or years ago, before the SuperNova dyes were introduced, Plaintiffs sat quiet.  Their requested relief now is thus not merely to delay the introduction of SuperNova until resolution of this case, but rather for Beckman instead to rip the already-introduced dyes from the market, at great reputational cost to Beckman and harming Beckman's customers and customer relationships.  Koksch ¶ 22.

## IV.        AN INJUNCTION WOULD BE AGAINST THE PUBLIC INTEREST

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24.  Here, the public interest would be best served by rejecting Plaintiffs' request to remove the SuperNova dyes from the market, particularly because SuperNova conjugates represent improvements over BD's Horizon Brilliant conjugates.  Koksch ¶¶ 14-15, 21.  Courts have made clear that where an accused product differs from the patentee's, offering customers the benefit of a meaningful choice, this weighs against an injunction.  *See, e.g.*, *Cordis Corp. v. Bos. Sci. Corp.*, 99 F. App'x 928, 935 (Fed. Cir. 2004); *Abbott Cardiovascular Sys., Inc. v. Edwards Lifesciences Corp.*, 2019 WL 2521305, at *27 (D. Del. June 6, 2019); *Conceptus, Inc. v. Hologic, Inc.*, 2012 WL 44064, at *4 (N.D. Cal. Jan. 9, 2012).

Plaintiffs' sole argument on this factor is that "[p]ublic policy supports the enforcement of valid patent rights."  Br. at 20.  It is true the public has an interest in protecting *valid* patents, but no such interest is served where, as here, the patents are invalid and not infringed.  *See Abbott*, 452 F.3d at 1348; *DNA Genotek Inc. v. Spectrum Sols. L.L.C.*, 2016 WL 8738225, at *5 (S.D. Cal. Oct. 6, 2016).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion.

Dated:  September 2, 2021

Respectfully submitted,

   /s/ Thomas H. L. Selby   

**BEHMER & BLACKFORD LLP**
Timothy S. Blackford (SBN 190900)
12526 High Bluff Drive, Suite 300
San Diego, CA 92130
Telephone: 858-792-3420

**WILLIAMS & CONNOLLY LLP**
Thomas H. L. Selby* (D.C. Bar No. 468855)
David M. Krinsky* (D.C. Bar No. 978190)
Teagan J. Gregory† (D.C. Bar No. 1019258)
D. Shayon Ghosh (Cal. Bar No. 313628)
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: 202-434-5000
Facsimile: 202-434-5029
* Admitted *pro hac vice*
† *Pro hac vice* application forthcoming

*Attorneys for Defendant Beckman Coulter, Inc.*